[3 NE3d 657, 980 NYS2d 320]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARTIN HEIDGEN, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TALIYAH TAYLOR, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FRANKLIN McPHERSON, Appellant.

Argued October 8, 2013; decided November 21, 2013

260

262

## POINTS OF COUNSEL

*Jillian S. Harrington,* Monroe Township, New Jersey, for appellant in the first above-entitled action. I. The People failed as a matter of law to prove Martin Heidgen's guilt of crimes involving a depraved indifference to human life beyond a reasonable doubt. (*People v Suarez,* 6 NY3d 202; *People v Payne,* 3 NY3d 266; *People v Contes,* 60 NY2d 620; *Jackson v Virginia,* 443 US 307; *People v Feingold,* 7 NY3d 288; *People v Squires,* 68 AD3d 900; *People v Beriguete,* 51 AD3d 939; *People v Mendez,* 34 AD3d 697; *People v Soto,* 8 AD3d 683; *People v Hines,* 97 NY2d 56.) II. Martin Heidgen was denied his right to a fair trial as a result of the trial court's decision to permit DNA testing in the middle of trial and then reverse its own decision and admit the previously excluded blood sample purported to be Mr. Heidgen's. (*People v Julian,* 41 NY2d 340; *People v Finkle,* 192 AD2d 783; *People v Rivera,* 184 AD2d 153; *People v Alomar,* 55 AD3d 617.) III. Martin Heidgen's blood was illegally obtained and improperly admitted into evidence at trial. (*Schmerber v California,* 384 US 757; *People v Allen,* 73 NY2d 378; *People v Kates,* 53 NY2d 591.) IV. The trial court erred in precluding the defense from presenting the testimony of a police accident reconstructionist. (*Boddie v Connecticut,* 401 US 371; *People v Berk,* 88 NY2d 257; *People v Gray,* 86 NY2d 10; *Matott v Ward,* 48 NY2d 455; *People v Negron,* 91 NY2d 788; *People v Crimmins,* 36 NY2d 230; *People v Lazartes,* 23 AD3d 400.) V. Martin Heidgen's right to a fair trial was violated by the trial court's failure to address certain instances of juror misconduct and his erroneous finding that others were unsubstantiated. (*Turner v Louisiana,* 379 US 466;

*People v Brown,* 48 NY2d 388; *Irvin v Dowd,* 366 US 717; *People v De Lucia,* 20 NY2d 275; *Parker v Gladden,* 385 US 363; *United States v Weiss,* 752 F2d 777; *United States v Beach,* 296 F2d 153; *People v Maragh,* 94 NY2d 569; *People v Friedgood,* 58 NY2d 467; *People v Arnold,* 96 NY2d 358.)

*Kathleen M. Rice, District Attorney,* Mineola (*Maureen McCormick, Tammy J. Smiley* and *Judith R. Sternberg* of counsel), for respondent in the first above-entitled action. I. Because defendant failed to timely object to the sufficiency of the evidence, that issue has not been preserved as a matter of law and is not reviewable in this Court. In any event, the evidence was legally sufficient to establish defendant's guilt of depraved indifference murder and assault. (*People v Kolupa,* 13 NY3d 786; *People v Lane,* 7 NY3d 888; *People v Hines,* 97 NY2d 56; *People v Kirkpatrick,* 32 NY2d 17; *People v Weakfall,* 87 AD3d 1353; *People v Dancy,* 87 AD3d 759; *Montgomery v Wood,* 727 F Supp 2d 171; *People v Abarrategui,* 306 AD2d 20; *People v Beriguete,* 51 AD3d 939; *People v Hawkins,* 11 NY3d 484.) II. Whether a sample of defendant's blood was legally drawn and tested following the collision presents a mixed question of law and fact and, because there was support in the record for the trial court's decision, that issue is not reviewable in this Court. (*People v Goodell,* 79 NY2d 869; *People v Bagley,* 211 AD2d 882; *People v Kates,* 53 NY2d 591; *People v Dixon,* 149 AD2d 75; *People v Harper,* 7 NY3d 882; *People v Danielson,* 9 NY3d 342.) III. The trial court reasonably exercised its discretion when it ordered mid-trial DNA testing of defendant's blood. (*People v Julian,* 41 NY2d 340; *People v Connelly,* 35 NY2d 171; *People v Sansalone,* 208 Misc 491; *People v Miller,* 174 AD2d 901; *Schmerber v California,* 384 US 757; *People v Finkle,* 192 AD2d 783; *People v Patterson,* 78 NY2d 711; *People v Colavito,* 87 NY2d 423; *People v Jenkins,* 98 NY2d 280; *People v Valencia,* 14 NY3d 927.) IV. The trial court did not err in refusing to qualify as an expert reconstructionist a witness who declared himself not to be such an expert. (*Matott v Ward,* 48 NY2d 455; *People v Brown,* 67 NY2d 555; *Sitaras v Ricciardi & Sons,* 154 AD2d 451; *People v Stephens,* 84 NY2d 990; *People v Iannelli,* 69 NY2d 684; *Beeley v Spencer,* 309 AD2d 1303; *People v Hanright,* 187 AD2d 1021; *Lombard v Dobson,* 16 AD2d 1031; *Werner v Sun Oil Co.,* 65 NY2d 839; *Crawford v Koloniaris,* 199 AD2d 235.) V. The trial court did not abuse its discretion when it limited the scope of the hearing on defendant's motion to set aside the verdict, and the court's findings of fact following the hearing were supported by the record. (*People v Samandarov,* 13 NY3d 433; *People v*

*Irizarry*, 83 NY2d 557; *People v Testa*, 61 NY2d 1008; *People v Maragh*, 94 NY2d 569; *People v De Lucia*, 20 NY2d 275; *People v Clark*, 81 NY2d 913; *People v Brown*, 48 NY2d 388; *People v Rodriguez*, 71 NY2d 214; *People v Harrell*, 284 AD2d 248.)

*Lynn W.L. Fahey, Appellate Advocates*, New York City (*Erica Horwitz* of counsel), for appellant in the second above-entitled action. The evidence was legally insufficient to prove that appellant, who took Ecstasy to "concentrate" better and "feel close" to her long deceased father, possessed a depraved indifference mens rea when, several hours later, she drove naked, speeding on the wrong side of the street and without lights, apparently oblivious to the danger she posed to herself and others, and killed a pedestrian and, moments later, hit another car. (*People v Suarez*, 6 NY3d 202; *Jackson v Virginia*, 443 US 307; *In re Winship*, 397 US 358; *People v Valencia*, 14 NY3d 927; *People v Feingold*, 7 NY3d 288; *People v Lewie*, 17 NY3d 348; *People v Jean-Baptiste*, 11 NY3d 539; *People v Bussey*, 19 NY3d 231; *People v Baker*, 14 NY3d 266.)

*Daniel M. Donovan, Jr., District Attorney*, Staten Island (*Anne Grady* and *Morrie I. Kleinbart* of counsel), for respondent in the second above-entitled action. Defendant's arguments are little else than a thinly disguised effort to obtain weight of the evidence review, unavailable in this Court. In any case, the evidence amply supported the jury's finding that defendant acted with depraved indifference when she struck Larry Simon and Jeanette and Vincent Cavalieri. (*People v Suarez*, 6 NY3d 202; *People v Russell*, 91 NY2d 280; *People v Feingold*, 7 NY3d 288; *People v Lewie*, 17 NY3d 348; *People v Ramos*, 19 NY3d 133; *People v Bauman*, 12 NY3d 152; *People v Barboni*, 21 NY3d 393; *People v Valencia*, 14 NY3d 927; *People v Harris*, 98 NY2d 452; *People v Butler*, 84 NY2d 627.)

*Edelstein & Grossman*, New York City (*Jonathan I. Edelstein* of counsel), for appellant in the third above-entitled action. I. Defendant's trial counsel was ineffective for not moving to dismiss the depraved indifference murder charge on *People v Feingold* (7 NY3d 288 [2006]) grounds. (*Strickland v Washington*, 466 US 668; *People v Baldi*, 54 NY2d 137; *Kyles v Whitley*, 514 US 419; *Rosario v Ercole*, 617 F3d 683; *Lockhart v Fretwell*, 506 US 364; *People v Murray*, 300 AD2d 819; *People v Stultz*, 2 NY3d 277; *Henry v Poole*, 409 F3d 48; *People v Ennis*, 11 NY3d 403; *People v Carter*, 7 NY3d 875.) II. Defendant's trial counsel was otherwise ineffective. (*Strickland v Washington*, 466 US

668; *People v Baldi*, 54 NY2d 137; *People v Feingold*, 7 NY3d 288; *People v Droz*, 39 NY2d 457; *People v Hoyte*, 185 Misc 2d 587, 294 AD2d 263; *People v Ryan*, 82 NY2d 497; *Jelinek v Costello*, 247 F Supp 2d 212; *People v Turner*, 5 NY3d 476; *People v Gutierrez*, 57 AD3d 1006; *People v Pacheco*, 50 AD3d 1063.) III. The evidence of depraved indifference murder and second-degree weapon possession was legally insufficient. (*People v Gray*, 86 NY2d 10; *United States v Gjurashaj*, 706 F2d 395; *United States v Allen*, 127 F3d 260; *United States v Hoy*, 137 F3d 726; *People v Robinson*, 36 NY2d 224; *United States v South*, 28 F3d 619; *People v Ficarrota*, 91 NY2d 244; *People v Ford*, 66 NY2d 428; *People v Cleague*, 22 NY2d 363; *People v Moore*, 291 AD2d 336.)

*Kathleen M. Rice, District Attorney*, Mineola (*Maureen McCormick, Tammy J. Smiley* and *Jason R. Richards* of counsel), for respondent in the third above-entitled action. I. In a case that offered virtually no viable defense, trial counsel nonetheless provided meaningful representation, fully satisfying defendant's constitutional right to the effective assistance of counsel. (*Strickland v Washington*, 466 US 668; *Kyles v Whitley*, 514 US 419; *People v Georgiou*, 38 AD3d 155; *People v Turner*, 5 NY3d 476; *People v Benevento*, 91 NY2d 708; *People v Stultz*, 2 NY3d 277; *People v Henry*, 95 NY2d 563; *People v Baldi*, 54 NY2d 137; *People v Hobot*, 84 NY2d 1021; *People v Walker*, 35 AD3d 512.) II. Jettisoning the Court's rule of preservation in favor of a federal model in order to review defendant's legal insufficiency claims, which are meritless in any event, would violate the State Constitution and diminish the truth-seeking function of the State's criminal courts. (*People v Gray*, 86 NY2d 10; *United States v Gjurashaj*, 706 F2d 395; *People v Hawkins*, 11 NY3d 484; *Skelos v Paterson*, 13 NY3d 141; *People v Whipple*, 97 NY2d 1; *People v Maloy*, 36 AD3d 1017; *People v Hollis*, 255 AD2d 615; *People v Feingold*, 7 NY3d 288.)

*Frank A. Sedita, III, District Attorney*, Buffalo, and *Anthony Girese, District Attorney*, Bronx (*Courtney Robbins* and *Joseph McCormack* of counsel), for District Attorneys Association of the State of New York, amicus curiae in the first, second and third above-entitled actions. I. As each jury was instructed that intoxication may negate a depraved indifference mens rea, each jury's factual determination of guilt must stand. (*People v Valencia*, 14 NY3d 927; *People v Baker*, 14 NY3d 266; *People v Schompert*, 19 NY2d 300; *People v Leonardi*, 143 NY 360; *People v Danielson*, 9 NY3d 342.) II. The evidence in each case is legally

sufficient as a matter of law under *People v Feingold* (7 NY3d 288 [2006]) to establish each appellant's guilt of depraved indifference murder. (*People v Lewie*, 17 NY3d 348; *People v Suarez*, 6 NY3d 202; *People v Gomez*, 65 NY2d 9; *People v Moquin*, 142 AD2d 347.) III. Intoxication should not negate the mens rea of depraved indifference. (*Montana v Egelhoff*, 518 US 37; *People v Perry*, 61 NY2d 849; *People v Le Grand*, 61 AD2d 815; *People v Lee*, 300 NY 422.) IV. The holding in *People v Feingold* (7 NY3d 288 [2006]) is difficult to harmonize with the Penal Law, thus making its application uncertain. (*People v Suarez*, 6 NY3d 202; *People v Payne*, 3 NY3d 266; *People v Prindle*, 16 NY3d 768; *People v Lewie*, 17 NY3d 348; *People v Matos*, 19 NY3d 470.) V. The legislative adoption of aggravated vehicular homicide does not supplant depraved indifference murder. (*People v Eboli*, 34 NY2d 281; *People v Bergerson*, 17 NY2d 398.)

### OPINION OF THE COURT

Chief Judge LIPPMAN.

Defendants in these three appeals challenge their convictions of depraved indifference murder. Each defendant drove in an outrageously reckless manner while intoxicated by alcohol or drugs and caused the death of at least one other person. Defendants maintain that the evidence was not legally sufficient to support their convictions—specifically, that there was insufficient proof that they had the requisite mental state of depraved indifference. Although intoxicated driving cases that present circumstances evincing a depraved indifference to human life are likely to be few and far between, we find that the evidence in each of these unusually egregious cases was legally sufficient to support the convictions.

## *People v Heidgen*

At about 4:30 p.m. on July 1, 2005, defendant Martin Heidgen met a friend for drinks at a Manhattan bar. When the friend left about three hours later, defendant, who remained at the bar, had already consumed six beers. Later that night, between 11:00 p.m. and midnight, defendant drove to a party at a friend's house in Merrick. Defendant proceeded to consume several additional alcoholic beverages at the party. Although he appeared to be intoxicated or "buzzed," defendant was not unsteady on his feet or slurring his words. Defendant left the party after about an hour and a half, without saying goodbye. It was not only well-known among their group of friends that there would

always be a place to stay or a designated driver available if necessary, but one friend testified that she had had a specific conversation with defendant to that effect about a week prior to the party.

Just before 2:00 a.m., witnesses saw defendant driving north on the southbound side of the Meadowbrook Parkway. One witness testified that she pulled over when she saw defendant's headlights coming at her and honked her horn three times, but that defendant did not deviate from the center lane or reduce his speed, which she estimated at about 70 to 75 miles per hour. A second witness testified that, when he saw defendant's pickup truck approaching, the witness drifted slightly to the left and that "it appeared as if [defendant's] car was drifting with me." After defendant passed him, the witness looked in his rearview mirror and observed that defendant's brake lights were not illuminated. The witness estimated defendant's speed at between 70 and 80 miles per hour.

A third witness testified that he had been driving his motorcycle on the northbound side of the Meadowbrook Parkway, when he saw defendant's vehicle on the wrong side of the road. He testified that he rode next to defendant—separated by the guardrail—and that they were traveling at about 70 miles per hour. Despite the witness's "loud" motorcycle at his side, defendant only looked straight ahead and appeared "very intent at driving." The witness lost sight of defendant's car when the guardrail was replaced by a median of trees and bushes.

After traveling about 2½ miles on the wrong side of the parkway, past multiple "wrong way" signs and the backs of several other road signs, defendant crashed head-on into a limousine that was bringing several family members home from a wedding. Both the driver, Stanley Rabinowitz, and seven-year-old passenger, Katie Flynn, were killed on impact. Several other family members sustained grievous physical injuries. One of the passengers in the limousine, Christopher Tangney, a former Nassau County Police Officer, testified to what he had observed through the vehicle's windshield. Tangney testified that they saw defendant coming at them, but that Rabinowitz was unable to move out of the left lane because there was another car next to them. Tangney estimated defendant's speed at about 65 miles per hour and observed that, when the limousine attempted to move to the right, defendant "seemed to follow us, the headlights."

Reverend Steed Davidson testified that he had been driving in the center lane at about 55 miles per hour and that the limousine had just finished passing him on the left when the crash occurred. Davidson testified that he saw defendant's headlights coming toward him, but was unable to react before impact. Davidson did not see defendant's vehicle swerve or slow down before the crash.

Defendant was arrested at the scene[1] and transported to the hospital. He smelled of alcohol and was generally characterized as either unresponsive or incoherent by police officers and medical professionals. At the request of the State Police, the emergency room nurse obtained a blood sample from defendant which revealed a blood alcohol concentration of .28%.[2]

Dr. Closson, a forensic toxicologist, testified for the prosecution that defendant's blood alcohol concentration meant that he would have had difficulty processing stimuli in the environment, that his cognitive abilities would have been impeded and that he could have had blurry, "tunnel vision," which would have reduced his peripheral vision. The blood alcohol concentration could have contributed to the disregard of substantial, or even grave, risks. Closson testified that a "divided attention activity," such as driving, would have presented difficulties because persons under the influence of alcohol are more likely to focus on one task than on performing several activities simultaneously. In addition, defendant's reaction time would have been decreased—although it would have decreased as a matter of seconds, rather than minutes, and would not have caused him to fail to perceive or react to his surroundings at all. Dr. Closson testified that the .28% reading meant that defendant had approximately 14 drinks in his system at the time of the test, but gave a "conservative estimate" that defendant had consumed at least 20 drinks in all.

---

**1.** Defendant was not advised that he was under arrest until about 10 hours later.

**2.** Defendant's pretrial motion to suppress the blood evidence, because it was obtained in violation of the time limits in Vehicle and Traffic Law § 1194 (2) (a) (1) and without his consent, was denied. During the course of the trial, the court precluded the blood evidence as inadmissible and unreliable due to defects in the chain of custody and inconsistent testimony from the officer who had secured the sample. However, the court granted the People's subsequent application pursuant to CPL 240.40 (2) (b) (v), requiring defendant to submit to a buccal swab for the purpose of comparing his DNA with the blood evidence. Defendant's DNA sample was ultimately determined to be a match and the court therefore allowed further testimony concerning the blood evidence.

Defendant was advised that he was under arrest at about 12:30 p.m. on July 2, although at that time he was not told that two people had been killed in the crash. Defendant told police that he had gotten into an argument over the telephone with his ex-girlfriend in Arkansas and that he went into "self-destruct mode." He related that he was "very upset and depressed" and had consumed a fifth of "Old Parr Scotch" before going out and driving around. Defendant complained that he had financial problems and that everything was going wrong since he had moved to New York from Arkansas. He also told the officers that his grandmother had recently passed away. In response to multiple police inquiries on the subject, defendant denied that he had been trying to hurt himself.

A letter that defendant wrote to one of his friends from prison explained that the statements he had made to the police were false. He noted that he had not spoken with his ex-girlfriend at all that night and that he did not have any financial problems. In addition, he pointed out that portions of his statement were lines from the movies *Ocean's Eleven* and *Pulp Fiction*. He further stated that the empty bottle of "Old Parr Scotch" in his apartment had been empty for months prior to the accident. Defendant indicated that he constructed this story in order to protect the hosts of the party and to portray himself as a person "worthy of leniency."

The defense retained an engineer, Steven Schneider, who was qualified as an accident reconstruction expert.[3] Schneider calculated that the limousine had been traveling at 49 miles per hour on impact. He further estimated that defendant's vehicle had been traveling somewhere between 27 and 38 miles per hour. The People did not call an expert and instead relied upon the testimony of lay eyewitnesses regarding defendant's speed.

The jury was instructed that, when determining whether defendant had acted with depraved indifference to human life, it should consider whether he was too intoxicated to be able to form the requisite mental state. Defendant was convicted after trial of two counts of murder in the second degree, three counts

---

**3.** Defendant sought to have the State Police officer who conducted the reconstruction in this case testify as an expert, but the People opposed the officer's qualifications concerning the type of accident that occurred here—an angular head-on collision. The court refused to qualify the officer as an expert witness, noting that the officer had never been qualified as an expert in any court and did not consider himself an expert in the type of calculations necessary in this case.

of assault in the first degree and two counts of operating a vehicle while under the influence of alcohol. The court denied defendant's posttrial motion to set aside the verdict, rejecting defendant's arguments asserting juror misconduct and that the People failed to prove beyond a reasonable doubt that he had the state of mind of depraved indifference to human life.

The Appellate Division affirmed, finding the evidence legally sufficient to support the conviction (87 AD3d 1016 [2d Dept 2011]). The Court also determined that the allegations of juror misconduct in defendant's CPL 330.30 motion were properly rejected. One Justice dissented in part and would have modified to reduce the convictions of murder in the second degree to manslaughter in the second degree and the convictions of assault in the first degree to assault in the second degree. The dissent would have found the evidence legally insufficient to support a finding of depraved indifference to human life, since the People failed to establish that defendant was aware of, and indifferent to, the grave risks presented by his conduct. The dissent would have found defendant "too inebriated to form such a mens rea" (87 AD3d at 1034). The dissenting Justice granted defendant leave to appeal to this Court (17 NY3d 957 [2011]) and we now affirm.

### *People v Taylor*

On October 18, 2006, defendant Taliyah Taylor spent most of the evening attempting to record a song she had written in honor of her late father, who had died when she was a child. Unable to recall the last verse of the song, she took Ecstasy at about 6:30 p.m. in order to help her focus and to feel closer to her father. She also drank one beer and smoked marijuana. A few hours later, defendant left the recording session, taking her young nephew with her "to get the evil off of [him]." She brought him to her mother's house, where she removed his clothing. Taylor also removed her own clothing to show that she had nothing to hide and should be accepted as she was. Defendant ran outside, still naked, attempting "to get away from everything, all the problems, all the hate, all the greed." Over her girlfriend's vigorous objections, Taylor then took the friend's car, later explaining that she wanted to drive "as fast as the car would take her."

At about 10:45 p.m., defendant drove on Forest Avenue in Staten Island (a local road with a posted speed limit of 35 miles per hour) at speeds between 80 and 90 miles per hour, without

headlights, on the wrong side of the road, and struck a pedestrian, Larry Simon, who was crossing the street. Defendant, who was wearing her seat belt, did not slow down, sound her horn or make any attempt to swerve. Simon was killed instantly, sustaining injuries that were more consistent with having been hit by a subway train than by a car. Without slowing, defendant continued driving in the lane for oncoming traffic, ran a red light and struck a vehicle that was stopped at that light, injuring the vehicle's occupants. Defendant's car then flipped over, before coming to rest in a parking lot.

Bystanders helped defendant from the vehicle and she began jumping up and down, chanting "money, power, respect." When the police arrived at the scene, defendant tried to drive away in an unattended squad car, but was stopped and arrested. When asked for her pedigree information, defendant gave her girlfriend's name instead of her own on three separate occasions. The emergency medical personnel generally characterized defendant as alert and coherent, though under the influence of drugs or alcohol. A blood test performed after midnight showed the presence of methylenedioxyamphetamine (MDA)[4] in a concentration that indicated defendant was still actively under the influence of the drug.

The forensic toxicologist testified that MDA is a central nervous system stimulant that, at higher dosages, can have hallucinogenic effects. He observed that individuals under the influence of MDA often exhibit enhanced risk-taking behavior and that they would have difficulty with a multi-task activity such as operating a motor vehicle—they might either switch tasks too quickly or focus on one task to the exclusion of others. Although cannabinoids were detected in an initial screening test, their presence was not confirmed by any followup testing. However, the toxicologist testified that cannabinoids are also hallucinogenic compounds and could have an additive or synergistic effect if taken with MDA.

One of the police officers testified that defendant told him that, "as she was driving, things were coming at her fast and she made the side to side motion also like she is avoiding things." When asked if she remembered hitting the pedestrian, she told the officer that "she saw him and then he was gone."

---

4. MDA is in the same chemical class as, and is a metabolite of, methylenedioxymethamphetamine (MDMA or Ecstasy). The forensic toxicologist testified that, as between MDA and MDMA, there would be "no significant difference in the effects" on the user.

She also related "that it was like she was in a movie, but she knew she wasn't in a movie."

The court denied defense counsel's motion to dismiss the depraved indifference murder charge, rejecting the argument that the People did not establish the necessary state of mind. The jury was instructed that it could consider whether defendant was too intoxicated to be capable of forming the mental state of depraved indifference. Defendant was convicted of murder in the second degree, reckless endangerment in the first degree and operating a motor vehicle while under the influence.

The Appellate Division affirmed, finding legally sufficient evidence to support the conviction (98 AD3d 593 [2d Dept 2012]). A Judge of this Court granted defendant leave to appeal (20 NY3d 1065 [2013]) and we now affirm.

### *People v McPherson*

At about 3:15 a.m. on October 19, 2007, defendant Franklin McPherson left a nightclub with his cousin, his girlfriend and one of her friends, and began arguing with his girlfriend in the parking lot. He was apparently upset that he had lost something and was seen searching through the trunk of his car. Witnesses then heard several gunshots and defendant drove away with his cousin in the car. Police later found five 9 millimeter shell casings in the parking lot.

At 3:30 a.m., defendant's car was seen driving west in the eastbound lanes of the Southern State Parkway at speeds of about 70 to 75 miles per hour. He traveled about five miles in the wrong direction, passing eight "wrong way" signs and the backs of 21 large signs that could only be read by eastbound drivers. A construction worker in the right-hand, eastbound lane, testified that when he saw defendant driving toward him, he blew his Mack truck's air horn for three or four seconds, but defendant just kept going. Other witnesses testified that cars were veering out of defendant's way but that defendant made no attempt to brake or to avoid other vehicles.

Near exit 13, defendant crashed head-on into a Jeep without slowing down, killing the Jeep's driver, Leslie Burgess, instantly. Defendant was placed under arrest and his blood alcohol content was measured at .19%. In a subsequent inventory search of his vehicle, police found 9 millimeter ammunition in the trunk, as well as an unloaded 9 millimeter handgun in the car. The gun was later determined to be the same one that had fired the

shots in the parking lot earlier that evening. A small plastic bag containing cocaine was also found inside defendant's vehicle.

Defense counsel argued to the jury during opening and closing statements that they had to determine whether McPherson had been capable of perceiving the risk presented by his behavior and purposely ignored that risk. In addition, when discussing how to formulate an appropriate jury charge on depraved indifference, the trial court specifically raised *People v Feingold* (7 NY3d 288 [2006]) and asked the parties whether the holding of that case was applicable if defendant was oblivious to his surroundings by virtue of his voluntary intoxication. Defense counsel, however, failed to move to dismiss the depraved indifference murder charge on that basis. The jury was instructed that it must consider whether defendant was intoxicated to such a degree that he was incapable of forming the mental state of depraved indifference.

Defendant was convicted of murder in the second degree, vehicular manslaughter in the first degree, aggravated driving while intoxicated, operating a motor vehicle while under the influence of alcohol, criminal possession of a weapon in the second degree and criminal possession of a controlled substance in the seventh degree. The Appellate Division affirmed, finding defendant's argument that the evidence was legally insufficient to support his conviction unpreserved for review and, in any event, without merit (89 AD3d 752 [2d Dept 2011]). The Court also rejected the argument that defendant received ineffective assistance of counsel.

One Justice dissented and would have modified, in the interest of justice, by reducing the second degree murder conviction to manslaughter in the second degree. The dissent would have found that the People failed to prove that defendant was aware that he was driving the wrong way on the highway and disregarded the grave risk of death to others. The dissenting Justice granted defendant leave to appeal to this Court (19 NY3d 969 [2012]) and we now affirm.

## Depraved Indifference

As we held in *People v Feingold* (7 NY3d 288 [2006]), depraved indifference is a culpable mental state. That mental state "is best understood as an utter disregard for the value of human life—a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not" (*Feingold*, 7 NY3d at 296 [internal quotation marks and

citation omitted]). Circumstantial evidence can be used to establish the necessary mens rea (see *Feingold*, 7 NY3d at 296).

The defendant in *Feingold* had been convicted of reckless endangerment in the first degree—recklessly engaging in conduct that creates a grave risk of death to others, under circumstances evincing a depraved indifference to human life. Feingold had attempted suicide by blowing out the pilot light of his stove and turning on the gas. However, a spark from the refrigerator caused an explosion, resulting in structural damage to his apartment building. Although we recognized that, viewed in the light most favorable to the People, the evidence could have supported the conclusion that defendant had the necessary mens rea, the trial judge's express finding that the defendant's state of mind did not reflect depraved indifference foreclosed such a determination in that case (see *Feingold*, 7 NY3d at 295).

More recently, in *People v Valencia* (14 NY3d 927 [2010]), we addressed a fact pattern similar to the cases at issue. After spending the evening drinking at a friend's house, the defendant drove in the wrong direction on a Long Island parkway at a high rate of speed, for about four miles. He crashed into two oncoming vehicles, causing serious physical injury to the drivers. Valencia's blood alcohol concentration was measured at .21%. We held that there was legally insufficient evidence to support the conviction for first degree (depraved indifference) assault, noting that "[t]he trial evidence established only that defendant was extremely intoxicated and did not establish that he acted with the culpable mental state of depraved indifference" (14 NY3d at 927-928).

*Valencia* is, however, distinguishable from the present cases. There, the trial judge, as the factfinder, determined that the defendant had been "oblivious" to the risks caused by his drunk driving at the time of the offense, but nevertheless convicted him of depraved indifference assault based simply on his earlier acts of drinking to the point of extreme intoxication, despite defendant's awareness that he would be driving in that condition later that evening (see 14 NY3d at 928 [Graffeo, J., concurring]). To the contrary, in each of the instant appeals, the jury was asked to decide whether the defendant was incapable of forming the requisite mental state by reason of his or her intoxication and each jury rejected the argument that defendant's impairment rose to that level. Further, none of the instant appeals presents the question of whether the mens rea of depraved indifference must be contemporaneous with the actus reus of the offense.

In *People v Prindle* (16 NY3d 768 [2011]), the defendant led the police on a high speed chase after attempting to steal two snow plows and ultimately crashed into another vehicle, killing one of its occupants. We reduced the defendant's depraved indifference murder conviction to manslaughter in the second degree. Observing that the jury had been instructed, without objection, according to the pre-*Feingold* standard of *People v Register* (60 NY2d 270 [1983]), we found that the evidence was legally insufficient to support the determination that defendant had demonstrated a depraved indifference to human life (*see Prindle*, 16 NY3d at 771). We compared Prindle's case to *People v Gomez* (65 NY2d 9, 12 [1985]), where, after striking two cars, the defendant drove on the sidewalk, struck and killed one child, refused his passenger's pleas to apply the brakes, continued to accelerate and struck another child on the sidewalk. By contrast, Prindle, although plainly driving in an unsafe manner, had been actively attempting to avoid hitting other vehicles.

These cases demonstrate that cases involving a depraved indifference to human life are highly fact-specific and dependent upon the individual defendant's particular mental state—a factor that may be extremely difficult to establish. Indeed, intoxicated driving cases in general, although clearly examples of dangerous behavior, are not thought of as "quintessential" cases of depraved indifference—such as,

> "firing into a crowd; driving an automobile along a crowded sidewalk at high speed; opening the lion's cage at the zoo; placing a time bomb in a public place; poisoning a well from which people are accustomed to draw water; opening a drawbridge as a train is about to pass over it and dropping stones from an overpass onto a busy highway" (*People v Suarez*, 6 NY3d 202, 214 [2005] [citations omitted]).

Recognizing that "it is important that law enforcement and prosecutors have the tools necessary to properly charge and convict [those] who have committed a DWI resulting in personal injury or death" (Senate Introducer Mem in Support, Bill Jacket, L 2007, ch 345 at 8), the legislature has enacted the aggravated vehicular homicide and assault statutes (Penal Law §§ 125.14, 120.04-a), which provide for enhanced punishment of those individuals who cause death or serious physical injury while operating a motor vehicle while intoxicated, when, for example, the individual has a blood alcohol content of at least .18. These statutes, however, do not foreclose the possibility of

prosecution for depraved indifference murder where egregious circumstances warrant that charge, as they do here.

"A verdict is legally sufficient when, viewing the facts in a light most favorable to the People, there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt" (*People v Danielson*, 9 NY3d 342, 349 [2007] [internal quotation marks and citations omitted]). The reviewing court must "marshal competent facts most favorable to the People and determine whether, as a matter of law, a jury could logically conclude that the People sustained its burden of proof" (*Danielson*, 9 NY3d at 349).

When viewed in the light most favorable to the People, there was legally sufficient evidence to support Heidgen's convictions for depraved indifference murder. The jury could have determined that defendant was unhappy and self-destructive. Defendant's friends who observed him at the party thought that he was intoxicated but not so intoxicated that he was incoherent, unsteady on his feet or slurring his speech. Heidgen drove the wrong way on the highway for over two miles without reacting to other drivers coming at him, car horns, or wrong way signage. Perhaps most significantly, more than one witness testified that defendant appeared to follow, or track, the headlights of oncoming vehicles. In addition, the toxicologist testified that defendant's blood alcohol level would have caused delayed reaction time, but that it would not have rendered him incapable of reacting at all. Based on this evidence, the jury could have found that, despite defendant's intoxication, he perceived his surroundings. The jury could have reasonably concluded that defendant drove, knowing that he was on the wrong side of the road and with an appreciation of the grave risks involved in that behavior.[5] One who engages in what amounts to a high speed game of chicken, with complete disregard for the value of the lives that are thereby endangered, is undoubtedly an individual whose culpability is the equivalent of an intentional murderer.

The evidence is likewise legally sufficient to support Taylor's conviction for depraved indifference murder. Taylor

---

5. [2] Similarly, the evidence is legally sufficient to support defendant's convictions for assault in the first degree (*see* Penal Law § 120.10 [3] ["A person is guilty of assault in the first degree when . . . (u)nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to another person"]).

buckled her seat belt and set out to drive as fast as she could go. She proceeded at speeds in excess of 80 miles per hour on a local road, without lights, at times on the wrong side of the street. Her statements to police revealed that she had perceived at least some of the obstacles in her path, notably the pedestrian victim prior to striking him. Taylor's behavior was obviously frenzied,[6] but it is also clear that she was aware of her surroundings. From the above evidence, the jury could have concluded that defendant recklessly engaged in conduct that created a grave risk of death to others, with an utter disregard for whether any harm came to those she imperiled.

For the same reasons, the evidence was legally sufficient to establish that Taylor was guilty of reckless endangerment in the first degree. As defendant herself observes, there was no change in her mental state between the time she struck the pedestrian and when she hit the other vehicle. Rather, after colliding with pedestrian Simon, she proceeded at full speed.

In *McPherson*, the depraved indifference argument arises in the context of an ineffective assistance of counsel claim. Defendant's trial took place in 2008, approximately two years after this Court's decision in *Feingold* which, as noted above, conclusively established depraved indifference as a culpable mental state. Indeed, when discussing how to formulate the jury charge, the trial court specifically raised *Feingold* to the parties—in particular, whether the holding applied if the defendant had been oblivious to his surroundings because he was voluntarily intoxicated. Under these circumstances, even if a reasonable defense lawyer might have questioned whether a motion to dismiss on this basis was "a clear winner," he or she could not have reasonably determined that the argument was "so weak as to be not worth raising" (*People v Turner*, 5 NY3d 476, 483 [2005]). Defense counsel should have moved to dismiss the charge of depraved indifference murder.

Nonetheless, defendant failed to establish that he received ineffective assistance of counsel. In evaluating an ineffective assistance of counsel claim, we have looked to the fairness of the proceedings as a whole, or whether defendant received meaningful representation. We have recognized that "a defendant's showing of prejudice [is] a significant but not indispensable element" in determining whether the standard of meaningful

---

**6.** Defendant had initially given notice of her intention to present a psychiatric defense, but that defense was abandoned during trial.

representation was achieved (*People v Stultz*, 2 NY3d 277, 284 [2004]).

Here, a motion to dismiss would not have been successful. The People established that defendant became enraged after losing something and fired off several gunshots. He then drove at excessive speed, in the wrong direction on the parkway for about five miles. During that time—more than four minutes—defendant did not appear to apply his brakes and several oncoming cars swerved to avoid him. He also passed numerous signs that should have alerted him that he was traveling in the wrong direction. In addition, he did not slow down or pull over in response to a truck driver sounding his air horn. There was, under the circumstances, ample evidence supporting the conclusion that defendant was aware that he was driving on the wrong side of the road and continued to do so with complete disregard for the lives of others. Therefore, although the motion to dismiss should have been made, we are persuaded that defendant was not prejudiced and otherwise received meaningful representation. Since there was no reasonable probability that the result would have been different, defendant's claim also fails under the federal standard (*see Strickland v Washington*, 466 US 668, 694 [1984]).

Perhaps the most difficult aspect of all of these cases is whether there was sufficient evidence that the defendants were aware of and appreciated the risks caused by their behavior—specifically, as to Heidgen and McPherson, that they knew they were driving on the wrong side of the parkway and proceeded regardless. However, as noted above, each jury rejected the conclusion that the defendant was too intoxicated to form the requisite intent. Despite defendants' seemingly inexplicable behavior, the People simply are not required to provide a motive for their conduct. Rather, depraved indifference can be proved circumstantially. Here, in each case, a rational jury could have found that the defendant, emboldened by alcohol or drugs, appreciated that he or she was engaging in conduct that presented a grave risk of death and totally disregarded that risk, with catastrophic consequences.

██ One of Heidgen's additional arguments merits further discussion. He asserts that his blood was illegally drawn without his consent or a warrant, and should have been suppressed. The suppression court found that it was unnecessary to obtain defendant's consent before drawing his blood because it would

have been impossible to do so, given his complete disorientation. This finding was undisturbed by the Appellate Division and there is support in the record for the determination (*see People v Harper*, 7 NY3d 882, 883 [2006]).[7]

Defendant also maintains that the police should have obtained a warrant before drawing his blood and that, under recent United States Supreme Court precedent, they were required to do so (*see Missouri v McNeely*, 569 US —, 133 S Ct 1552 [2013]). In *McNeely*, the Supreme Court held that the natural dissipation of alcohol from the blood does not constitute a per se exigency justifying an exception to the warrant requirement of the Fourth Amendment—rather, whether a warrantless blood test was reasonable is dependent on the circumstances of the particular case (*see* 569 US at —, 133 S Ct at 1563).

■ We note that, unlike the defendant in *McNeely*, Heidgen did not refuse to consent to the blood test. His blood was taken pursuant to a statutory presumption of consent to chemical testing that applies to all persons who operate vehicles within the state (*see* Vehicle and Traffic Law § 1194 [2] [a]). Although defendant raised several arguments at the suppression hearing concerning the validity of his blood test—whether the blood had been drawn by a licensed professional nurse, whether it was drawn within the statutory time limits and whether he was capable of consent—the current argument was not one of them. In the midst of an argument that Heidgen should have been asked for his consent, counsel at one point stated that "they should have called the district attorney's office, or certainly secured a warrant, and they didn't." This in no way amounts to an argument that the drawing of defendant's blood while he was incapacitated, under a statutory presumption of consent, violated his Fourth Amendment rights. Under the circumstances, we find the current argument unpreserved for our review.

We have considered defendants' remaining arguments and find them to be without merit.

---

7. [7] Relatedly, defendant argues that his blood was drawn in violation of the requirements in Vehicle and Traffic Law § 1194 (2) (a) (1), authorizing the police to obtain a blood sample within two hours of a person's arrest for driving under the influence of alcohol. This argument is dependent on defendant's assertion that he was not formally arrested until about 10 hours after the accident. However, the suppression court found that defendant was arrested at the scene pursuant to probable cause and the Appellate Division did not upset this finding. There is record support for that determination, rendering it beyond our further review. The blood test was therefore timely under the Vehicle and Traffic Law.

Accordingly, the order of the Appellate Division in each case should be affirmed.

SMITH, J. (dissenting). We have said several times that depraved indifference to human life is a very unusual state of mind (*see People v Lewie*, 17 NY3d 348, 359 [2011]; *People v Suarez*, 6 NY3d 202, 212 [2005]; *People v Payne*, 3 NY3d 266, 270 [2004]). But experience shows that juries, especially in cases with inflammatory facts, will often find depraved indifference where the evidence does not support it, and as a result we have reversed many convictions in recent years because the proof of this mens rea was insufficient (*see People v Barboni*, 21 NY3d 393, 408 n [2013, Smith, J., concurring] [collecting cases]).

Cases in which intoxicated drivers kill innocent people are among the most inflammatory, and thus among the most likely to generate depraved indifference murder convictions where a conviction of a lesser (but still serious) crime is all that is warranted. These three cases, to my mind, exemplify that problem. The majority says "intoxicated driving cases that present circumstances evincing a depraved indifference to human life are likely to be few and far between" (majority op at 267)—yet today it affirms all three of these convictions. In doing so, it departs from the rigor we have previously shown and makes it more difficult to attain our long-sought goal of reserving convictions of this crime for the very few cases that warrant them.

I find the evidence in all three cases insufficient to support murder convictions. My reasoning differs as between the *Heidgen* and *McPherson* cases on the one hand, and *Taylor* on the other.

I

*Heidgen* and *McPherson* are very similar cases. (In *McPherson*, a preservation problem complicates the analysis, but I agree with the majority that, for the reasons it explains, *McPherson* ultimately turns, as does *Heidgen*, on whether the evidence of depraved indifference was sufficient.) In both cases, a man became extremely drunk, drove for miles the wrong way on a divided highway, and caused a fatal accident. The simplest and likeliest inference from the evidence is that both men were so drunk that they did not know what they were doing. Why, after all, would anyone do such a dangerous thing on purpose?

Of course, Heidgen's and McPherson's drunkenness does not excuse what they did. They were unforgivably reckless in get-

ting on the highway at all in the condition they were in, and the consequences of their recklessness were horrible. They were unquestionably guilty of manslaughter in the second degree, a class C felony punishable by up to 15 years in prison (Penal Law §§ 125.15 [1]; 70.00 [2] [c]), and under today's statutes they would also be guilty of aggravated vehicular homicide, a class B felony punishable by up to 25 years (Penal Law §§ 125.14 [1], [4]; 70.00 [2] [b]). But it is clear, and the majority implicitly recognizes, that unless these two defendants knew they were driving the wrong way they were not guilty of depraved indifference murder. In the absence of such knowledge, their conduct does not show "depraved indifference to human life" (Penal Law § 125.25 [2]), which we have defined to mean "an utter disregard for the value of human life—a willingness to act . . . because one simply doesn't care whether grievous harm results or not" (majority op at 274, quoting *People v Feingold*, 7 NY3d 288, 296 [2006]; *see People v Valencia*, 14 NY3d 927 [2010]).

The majority decides that the jury could have found that Heidgen and McPherson "knew they were driving on the wrong side of the parkway and proceeded regardless" (majority op at 279). I agree that, if that happened, these defendants could be found guilty of depraved indifference murder; and perhaps it did happen—but I do not see how a rational jury could find beyond a reasonable doubt that it did. Anyone who knowingly drives the wrong way on a divided highway must either have chosen a bizarre way of committing suicide or else be prey to some grandiose illusion that all the other cars will get out of his way. These records contain no more than hints that either Heidgen or McPherson was in such an extraordinary state of mind.

As to Heidgen, there is some evidence that he had been feeling depressed, but there is also much uncontroverted evidence that he seemed cheerful on the evening in question. He told police after the accident that he had been in "self-destruct mode"; but in the same conversation he forcefully denied that he was trying to harm himself ("No, not under any circumstances"). Drunk driving is itself self-destructive behavior, and I see no basis for inferring that Heidgen's reference to his own self-destructiveness meant anything more than this.

The majority relies more heavily on the testimony of two witnesses that, the majority says, would justify a finding that Heidgen engaged "in what amounts to a high speed game of chicken" (majority op at 277). One of the witnesses said that, when the

witness's own car "drifted a little to the left . . . . it appeared as if [Heidgen's] car was drifting with me." Another, a passenger in the limousine that Heidgen crashed into, testified that Heidgen's car "moved . . . toward us . . . . seemed to follow us." This *could* mean that Heidgen was deliberately aiming his car at the others, but I do not see how a reasonable juror could infer, with the confidence necessary to support a criminal conviction, that that is what he was doing. It is an extremely unusual thing to do.

As to McPherson, the evidence of a depraved state of mind is even thinner. It is a fair inference from the record that, before he started to drive, McPherson was angry at his girlfriend and fired several gunshots (not, so far as the record shows, at anyone or anything in particular). This simply does not prove that McPherson was either suicidal or on a near-insane pursuit of thrills—as he would have to be to drive knowingly the wrong way. It is much more likely that, in his drunken rage, he did not focus on his surroundings after he started driving.

As to both Heidgen and McPherson, the majority suggests that the very fact that they did drive the wrong way for miles, ignoring many signs and other events that should have alerted them, supports an inference that they knew what they were doing. To me, it supports more strongly the inference that—as blood tests proved—they were very drunk. Ignoring warnings that would alert a sober person is what drunk people do. I do not doubt that, as the majority says, a drunk person is not biologically incapable of perceiving and reacting to his surroundings, but anyone who has ever met one knows that they often fail to do so.

I find the *Heidgen* and *McPherson* cases to be indistinguishable from *People v Valencia* (14 NY3d 927 [2010]), another case involving a drunken wrong-way driver. The majority distinguishes *Valencia* on the ground that there was, in that case, a finding of fact that defendant was oblivious to the risks he was running (majority op at 275). But our memorandum in *Valencia* does not rely on, or even mention, that finding; it says the evidence was "insufficient" to support a finding of depraved indifference. If it was insufficient there, it is insufficient here.

There is, of course, one conspicuous difference between these two cases and *Valencia*: Valencia did not kill anyone. The conviction we reversed in *Valencia* was for depraved indifference assault. In these cases, three people died, one of them a young

child. Heidgen and McPherson are at fault for these deaths, and deserve severe punishment. But they are not—or at least, were not proved to be—murderers. They did not kill their victims intentionally, and—drawing all reasonable inferences in favor of the People—there is no more than a possibility that they did so with depraved indifference to human life. Their convictions should be reduced to manslaughter in the second degree.

## II

I would also reduce Taylor's conviction, but hers is a different sort of case.

While we can only guess what was in Heidgen's and McPherson's minds when they committed their crimes, there is considerable evidence of what Taylor was thinking. While recording a song in tribute to her long-deceased father, she took Ecstasy and drank beer to help her feel "closer to her father" and "concentrate more." Then, after becoming annoyed with a friend, she left the recording session, taking her nephew with her to "get like the evil off" the child. She took the boy to her mother's house, where she removed first his clothes and then her own. After an argument with her mother, she left the house, still naked, trying "to get away from everything, all the problems, all the hate, all the greed." She got into a car, wanting to drive it "as fast as the car would take her, as fast as she could." She believed that "God wanted her to drive naked." As she was driving she observed that "things were coming at her fast." She eventually hit and killed a pedestrian: She later remembered "him being there and then being gone." After she hit another car and hers turned over, she was found with her eyes shut, saying "money, power, respect"—a chant she resumed after leaving the car, while jumping up and down. Then she got into a police car and tried unsuccessfully to drive it away.

On this record, a reasonable juror could infer beyond a reasonable doubt that Taylor chose to drive at a very high speed, that she knew that she might hit someone, and that she was unmoved by that risk. If she were not so obviously mentally impaired, it might be reasonable to conclude from these facts that she was depravedly indifferent to human life. But in my view, those words simply cannot be applied to someone so unhinged.

I do not suggest that Taylor was legally insane (though I am somewhat surprised she did not raise an insanity defense), or

that she had an extreme emotional disturbance as that term is used in the Penal Law (§ 125.25 [1] [a]; such a disturbance reduces what would otherwise be intentional murder to manslaughter, but is not mentioned in the depraved indifference murder statute). Still, it is hardly debatable that, even by comparison with other intoxicated drivers, Taylor was in a highly abnormal condition. Depraved indifference—the willingness to risk harm because one simply does not care—is a more clear-sighted and cold-blooded state of mind than the one this record shows. I would therefore reduce Taylor's conviction, as well as Heidgen's and McPherson's, to second degree manslaughter.

READ, J. (dissenting). Judge Smith amply demonstrates that the evidence in these three cases is insufficient to support murder convictions under our depraved indifference murder jurisprudence as it has stood at least since *People v Feingold* (7 NY3d 288 [2006]) overruled *People v Register* (60 NY2d 270 [1983], *cert denied* 466 US 953 [1984]). We have elsewhere recounted the stepwise progression of our retreat from *Register* (*see generally Feingold*, 7 NY3d at 290-294; *Policano v Herbert*, 7 NY3d 588 [2006]), and there is no need to repeat that narrative here. Suffice it to say that jettisoning *Register* was controversial. Only three of the current members of the Court participated in the relevant decisions; and two of the three were not persuaded that overruling *Register* was wise or necessary, at least not initially (*see People v Suarez*, 6 NY3d 202, 219 [2005, Read, J., concurring in result on constraint; Graffeo, J., dissenting]). But the Court ultimately decided that depraved indifference is a culpable mental state; that recklessness, no matter how extreme, is not enough by itself to support a conviction for the crime of depraved indifference murder. Under *Register*, by contrast, a conviction for depraved indifference murder hinged upon an objective assessment of the degree of risk presented by the defendant's reckless conduct.

Essentially, the majority has resurrected the *Register* standard for cases in which intoxicated drivers kill innocent people, or at least has done so here in order to salvage these three convictions. But any departure from *Feingold* for drunk driving cases is contrary not only to our precedent, but also to legislative intent. The legislature in 2007—just a year after we decided *Feingold*—amended the Penal Law to create the new crime of aggravated vehicular homicide, a class B felony with a penalty of up to 25 years in prison (*see* Penal Law § 125.14; *see also* L

2007, ch 345).* This crime occurs when an individual kills someone while driving with ability impaired by alcohol or drugs, along with the presence of at least one of the following factors: a blood alcohol content of .18 or higher; a DWI conviction within the previous 10 years; the crash caused the death of more than a single person; the crash killed one person and severely injured another; a previous conviction under Penal Law articles 120 or 125 involving the operation of a motor vehicle; the crash caused the death of a passenger in the offender's vehicle who was a child of 15 years of age or less; or the offender was driving with a suspended or revoked license from any state.

In fashioning this crime, the legislature was, at least in part, responding to prosecutors' pleas that "[r]ecent court decisions [i.e., *Feingold* and the decisions leading up to it] ha[d] *so limited the application of the depraved indifference statutes to vehicular crimes as to make them inapplicable*"; and "[p]erversely," a driver might as a result try to defend against such a charge by using a claim of extreme intoxication to negate the newly required culpable mental state (*id.* at 15-16, June 15, 2007 letter from District Attorneys Association of the State of New York [emphasis added]; *see also* Paul Shechtman, *The Meaning of Depraved-Indifference Murder; New Legislation?*, NYLJ, Apr. 4, 2005 at 26, col 1 [exploring the implications of the Court's evolving depraved indifference jurisprudence for the intoxication defense]).

In sum, the legislature has addressed the proper standards for assessing the culpability of drunk drivers who cause fatalities, and the proper measure of their punishment. And it did not choose to do so by amending the second-degree murder statute, which the majority now reinterprets so as to uphold these convictions for depraved indifference murder.

Judges Graffeo, Pigott, Rivera and Abdus-Salaam concur with Chief Judge Lippman; Judge Smith dissents in an opinion in which Judge Read concurs in a separate opinion.

In each case: Order affirmed.

---

* The fatalities in these three cases predated the statute's effective date.